UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WOLVERINE BARCODE IP LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-CV-1448-B |
| | § | |
| ALBERTSONS COMPANIES, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Albertsons Companies, Inc. ("Albertsons")'s Motion to Dismiss (Doc. 24) made pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Plaintiff Wolverine Barcode IP LLC ("Wolverine") has filed a response (Doc. 29), and Albertsons has filed a reply (Doc. 30). For the reasons that follow, the Motion is **GRANTED**, and the case is **DISMISSED WITH PREJUDICE**.

## I.

## BACKGROUND

Wolverine owns U.S. Patent No. 9,280,689, which is titled "Method and Apparatus for Conducting Offline Commerce Transactions." *See* Doc. 1, Compl. ¶ 6; '689 Patent, Title. Albertsons operates grocery stores where customers can pay through their mobile devices using personal "Albertsons Cash" accounts. *See generally* Doc. 1-2, Compl. Ex. 2. In this lawsuit, Wolverine has accused Albertsons of directly and indirectly infringing the '689 Patent through the Albertsons Cash service. *See* Doc. 1, Compl. ¶¶ 8–12.

The '689 Patent "relates to novel and improved methods and apparatuses for conducting offline transactions that use a barcode as a method of personal identification." *Id.* ¶ 7. When the '689 Patent was filed in 2011, customers would "pay for goods priced in micro payment levels, such as five cents or ten cents[,] using cash." '689 Patent at 1:26–27. Although credit cards were used for larger transactions, they were impractical for such small amounts because the transaction fee was too high relative to the purchase amount. *See id.* at 1:27–31. The '689 Patent "introduce[d] a new method for identifying a user [i.e., customer] using the User ID Barcode, allowing the user to charge purchasing of goods priced in micro payment level or non-micro payment level either offline or online at a participating vendor site." *Id.* at 2:34–38.

The '689 Patent has three "claims," or distinct inventions, that it covers. *See id.* at 17:30 to 18:34. Claim 1 is independent, and Claims 2 and 3 depend upon the claimed method in Claim 1. *See id.* Claim 1 reads:[1]

> 1. A method for conducting offline electronic commerce transactions having a vendor barcode scanner and a vendor cash register comprising:
>
> (a) providing a personal code to a person for their use to purchase goods;
>
> (b) converting said personal code into barcode format to form a User ID Barcode, said User ID Barcode corresponding to said personal code and including at least one special character to distinguish the barcode as a User ID Barcode from a product barcode;
>
> (c) storing said personal code in said User ID Barcode format by said person for use to purchase goods and storing said personal code in a User Vendor Management Server to permit purchases to be made at a vendor;
>
> (d) establishing a User Account in a User Vendor Management Server corresponding to said personal code;
>
> (e) depositing funds in said User Account to establish a credit limit;

---

[1] Mark this point in the opinion for easy future reference because the letter-labeled steps will come up again in the Analysis section.

(f) conducting purchases at vendors each having a vendor server wherein each purchase includes scanning product barcodes including product price and said User ID Barcode with a product barcode scanner at the vendor cash register and transmitting both product barcodes and User ID Barcode to said vendor server;

(g) detecting the User ID Barcode at the vendor server and forwarding the ID Barcode and purchase price to said User Vendor Management Server;

(h) comparing the purchase price with the funds in said User Vendor Management Server to determine if there are available funds within the credit limit in the User Vendor Management Server account, and if there are, sending an approval signal to the vendor server;

(i) forwarding the approval signal to the vendor cash register; and

(j)[2] repeating steps (f) through (i) for subsequent purchase transactions using said User ID Barcode.

*Id.* at 17:31 to 18:29. Claim 2 adds: "The method of claim 1 wherein said User ID Barcode is stored by said person in a cell phone." *Id.* at 18:30–31. Claim 3 adds: "The method of claim 1 wherein said User ID Barcode is stored by said person on a label secured to a credit card or secured to a user's cell phone." *Id.* at 18:32–34.

Wolverine attached to its Complaint a chart with Claim 1's language, annotated depictions of how the Albertsons Cash system works, and some added description of how Albertsons allegedly infringes Claim 1. *See generally* Doc. 1-2, Compl. Ex. 2.

Albertsons moved to dismiss the Complaint on grounds that the '689 Patent is ineligible for patent protection and that Wolverine failed to plausibly allege infringement. *See generally* Doc. 24, Mot. Dismiss. The Court considers the motion to dismiss below.

---

[2] The '689 Patent erroneously labels this step with the letter "i." To avoid confusion, "j" is used here and throughout the Analysis section below to refer to Claim 1's ultimate step.

## II.

## LEGAL STANDARD

Fifth Circuit law governs the procedural question of whether Wolverine stated a plausible patent infringement claim. *See Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1259 (Fed. Cir. 2018) (citation omitted). The standard should be familiar: Rule 12(b)(6) allows a defendant to move to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In considering whether the plaintiff has stated a claim, courts must "accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citations omitted).

Within this familiar inquiry, Federal Circuit law applies to all "substantive issues of patent law." *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015) (citation omitted). That includes the two grounds for Rule 12(b)(6) dismissal asserted here: patent ineligibility and non-infringement.

For patent ineligibility, all "patents granted by the Patent and Trademark Office are presumptively valid." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019) (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 (2011)). Nevertheless, a defendant can attempt to overcome the "presumption of validity" by "prov[ing] that the patent never should have issued in the first place." *Id.* (internal quotation mark omitted) (quoting *Microsoft*, 564 U.S. at 96–97). Patent

"[e]ligibility under 35 U.S.C. § 101 is a question of law, based on underlying facts." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (citations omitted). "Like other legal questions based on underlying facts, this question may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law." *Id.* (collecting cases).

The other asserted ground for dismissal—non-infringement—also requires reference to Federal Circuit law. *See AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 35 (Fed. Cir. 2024) (citation omitted) ("We apply our own law to the specific question of whether a complaint states a claim of patent infringement on which relief may be granted."). "[A]n adequate complaint need only contain 'some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim.'" *Id.* (citation omitted). But if a court determines that a patent is invalid due to ineligibility, the court should not make a determination on infringement because it would "constitute[] an impermissible advisory opinion." *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718 (Fed. Cir. 2014) (Mayer, J., concurring) (citing *Oil, Chem. & Atomic Workers Int'l Union v. Missouri*, 361 U.S. 363, 367 (1960)).

## III.

## ANALYSIS

The '689 Patent claims a patent-ineligible abstract idea and is therefore invalid. To explain why, the Court first summarizes relevant portions of the legal framework for assessing patent eligibility. Next, the Court analyzes the '689 Patent according to that framework. Finally, the Court addresses why leave to amend would be futile.

A.      *Assessing Patent Eligibility Involves a Two-Step Analysis.*

"Section 101 of the Patent Act defines the subject matter eligible for patent protection." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). Section 101 has four categories of patentable subject matter: "any new and useful [1] process, [2] machine, [3] manufacture, or [4] composition of matter." A patent may also be issued for "any new and useful improvement" in one of those four categories. § 101. "Other than as so limited, the patent system is described as available to 'anything under the sun that is made by man.'" *Internet Pats. Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1345 (Fed. Cir. 2015) (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980)).

But § 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 573 U.S. at 216 (citation omitted). Those three patent-ineligible concepts are "the basic tools of scientific and technological work." *Id.* (citation omitted). To grant someone the exclusive right to a law of nature, natural phenomenon, or abstract idea would lead to "monopolization" that "might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." *Id.* (citation modified); *see* U.S. Const., art. I, § 8, cl. 8 ("The Congress shall have Power . . . [t]o promote the Progress of Science and useful Arts . . . ."). Monopolization of these patent-ineligible concepts would be harmful because, as "the building blocks of human ingenuity," the concepts are *in* every patentable invention. *See Alice*, 573 U.S. at 217 (citation omitted).

Marking the line between patent-ineligible abstract ideas and patent-eligible processes invented using those ideas has proven to be a challenging task for courts. *See Internet Pats.*, 790 F.3d at 1345. Because many patents are "drafting effort[s] designed to monopolize" abstract ideas, *see Alice*, 573 U.S. at 221 (citation omitted), courts conducting an eligibility analysis under § 101 must

be careful not to be "deceived by the 'draftsman's art.'" *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016) (quoting *Alice*, 573 U.S. at 226). To help lower courts conduct the analysis, the Supreme Court in *Alice* established a two-step analytical framework. *See* 573 U.S. at 217–18.

    1.    <u>*Alice* Step One</u>

Step one is to "determine whether the claims at issue are directed to one of [the] patent-ineligible concepts," such as abstract ideas. *Id.* at 217 (citation omitted). What the patent claims are "directed to" involves "looking at the 'focus' of the claims, their 'character as a whole.'" *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (citations and internal quotation marks omitted). More concretely, the inquiry requires identifying "what the patent asserts to be the 'focus of the claimed advance over the prior art.'" *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1097 (Fed. Cir. 2021) (quoting *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019)). When identifying the claims' "focus," a court must be careful not to generalize too broadly because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Solutran*, 931 F.3d at 1168 (quoting *Mayo Collab. Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 71 (2012)).

To identify the "focus," a patent's specification may be helpful, but its claim language is paramount. *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019). The specification is "useful in understanding 'the problem facing the inventor' as well as what the patent describes as the invention." *Id.* at 767. "But while the specification may help illuminate the true focus of a claim, when analyzing patent eligibility, reliance on the specification must always yield to

the claim language in identifying that focus." *Id.* at 766. A court therefore does not err in identifying a "focus" of the claims that is "directly tethered to the claim language." *Solutran*, 931 F.3d at 1168.

Once a court has identified the claims' "focus," a court must determine whether that "focus" is a patent-ineligible concept. "The inquiry often is whether the claims are directed to 'a specific means or method' for improving technology or whether they are simply directed to an abstract end-result." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (citing *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)). "Limiting the invention to a technological environment does 'not make an abstract concept any less abstract under step one.'" *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (quoting *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017)). Neither does "[a]dding one abstract idea . . . to another abstract idea . . . render the claim non-abstract." *RecogniCorp*, 855 F.3d at 1327.

At step one, the Federal Circuit and Supreme Court "have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 822 F.3d at 1334. As relevant to this case, "fundamental economic practice[s]" are patent-ineligible abstract ideas, "even where the financial transaction claimed includes physical components." *See W. Express Bancshares, LLC v. Green Dot Corp.*, 816 F. App'x 485, 486 (Fed. Cir. 2020) (citations omitted) (collecting Supreme Court and Federal Circuit cases). If "the innovative aspect of the claimed invention [is] an entrepreneurial rather than a technological one," the claim is not eligible for patent protection. *See Solutran*, 931 F.3d at 1166 (quoting *Ultramercial*, 772 F.3d at 722 (Mayer, J., concurring)).

2.    _Alice Step Two_[3]

Step two—which should be reached only if a court determines at step one that the patent's claims are directed to an abstract idea—prompts the court to ask, "[w]hat else is there in the claims before us?" _Alice_, 573 U.S. at 217 (citation omitted). "To answer that question, [a court] consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." _Id._ (quoting _Mayo_, 566 U.S. at 79, 78). Step two is the "search for an 'inventive concept.'" _Id._ at 217 (citation omitted). "An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer." _BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC_, 827 F.3d 1341, 1349 (Fed. Cir. 2016) (citing _Alice_, 573 U.S. at 222–23).

A patent is ineligible for protection when the patent's claims entirely lack concepts that could be considered inventive. _See, e.g., Two-Way Media, Ltd. v. Comcast Cable Commc'ns, LLC_, 874 F.3d 1329, 1338–39 (Fed. Cir. 2017). When a patent is directed to an abstract end-result, "[i]nquiry . . . must turn to any requirements for _how_ the desired result is achieved." _Id._ at 1339 (quoting _Elec. Power Grp._, 830 F.3d at 1355). Mere "invocations of computers and networks that are not even arguably inventive are 'insufficient to pass the test of an inventive concept in the application' of an abstract idea." _Elec. Power Grp._, 830 F.3d at 1355 (citations omitted).

---

[3] If parts of step two's framework sound the same as step one, that is somewhat by design. "[T]he two stages involve overlapping scrutiny of the content of the claims," and "there can be close questions about when the inquiry should proceed from the first stage to the second." _Elec. Power Grp._, 830 F.3d at 1353 (citations omitted). Think of step two as a "lifeline" providing for more rigorous scrutiny after a patent fails step one. _See CosmoKey_, 15 F.4th at 1100 (Reyna, J., concurring).

At the motion-to-dismiss stage, a court should "search for an inventive concept in precisely the factors that [the plaintiff] argues comprises the inventive concept." *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 911 (Fed. Cir. 2017). If "the alleged 'inventive concept' that solves problems identified in the field . . . is the abstract idea itself," the claim does not survive step two. *See ChargePoint*, 920 F.3d at 774.

B.      *The '689 Patent is Ineligible for Patent Protection.*

Assessing the '689 Patent's claims at *Alice* step one, the Court determines that they are directed to the abstract idea of setting up individual customer accounts and allowing those accounts to be used for purchases. At step two, the Court concludes that the '689 Patent is ineligible for patent protection because it contains no inventive concept to transform the patent-ineligible abstract idea into a patent-eligible application of the idea.

1.      At *Alice* Step One, the '689 Patent is Directed to the Abstract Idea of Setting Up Individual Customer Accounts and Allowing Those Accounts to be Used for Purchases.

The parties offer competing statements of the '689 Patent's "focus." Pulling from the '689 Patent's Abstract, Wolverine contends that the focus is "Methods and apparatus for conducting offline commerce transactions that use a barcode as an alternative means for personal identification." Doc. 29, Resp., 4 (quoting '689 Patent, Abstract). Albertsons asserts that the focus is "nothing more than verifying a customer's ability to pay." Doc. 24, Mot., 6.

Neither party's statement of the focus adequately captures the claims' "character as a whole." *See Elec. Power Grp.*, 830 F.3d at 1353 (citation omitted). To start, Wolverine's proffered focus comes only from the '689 Patent's Abstract and is altogether "untethered from the language of the claims." *See Enfish*, 822 F.3d at 1337 (citations omitted). Although Wolverine is correct that the '689 Patent's specification and Abstract may be consulted to illuminate the claims' focus, *see* Doc. 29, Resp., 4 &

n.20, "reliance on the specification must *always* yield to the claim language in identifying that focus." *ChargePoint*, 920 F.3d at 766 (emphasis added). The Court therefore rejects Wolverine's proffered focus.

Albertsons's proffered focus—"verifying a customer's ability to pay"—is also presented primarily through specification language, *see* Doc. 24, Mot., 5–6, but it fails because it overgeneralizes and describes the claims at too high a level of abstraction. *See Enfish*, 822 F.3d at 1337 ("[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." (citations omitted)). True, as discussed later in this subsection, "verifying a customer's ability to pay" is *an* abstract idea that is represented in the '689 Patent. But "the claims are not simply directed to *any* form of" verifying ability to pay, but "instead are specifically directed to" an idea on how to conduct transactions (which involves verifying ability to pay). *See id.* To Albertsons's credit, it gets much closer to identifying the proper focus when it says: "The claims, taken as a whole, require scanning a barcode, checking a server to see whether the customer has enough money, and then telling the register whether or not the customer has enough money." Doc. 30, Reply, 2.

Looking first to the specification to "illuminate" the claims' focus, "the problem facing the inventor" was finding a means to pay that does not use cash or a credit card. *See ChargePoint*, 920 F.3d at 766–67. Prior to the '689 Patent's issuance, small payments that were not worth the credit card transaction fee were made using cash. *See* '689 Patent at 1:26–31. To enable customers to pay without cash or a credit card, the '689 Patent "introduce[d] a new method for identifying a user using the User ID Barcode, allowing the user to charge purchasing of goods priced [at any level] either online or offline at a participating vendor site." *Id.* at 2:34–38. That newly introduced method

is "what the patent describes as the invention," *see ChargePoint*, 920 F.3d at 767, and is acknowledged by both parties. *Compare* Doc. 24, Mot., 5 (citing '689 Patent at 2:34–36), *with* Doc. 29, Resp., 5 & n.22 (citing '689 Patent at 2:34–38).

Guided by the specification's illumination, the Court determines that the '689 Patent's claims are directed to a process for setting up individual user accounts and allowing those accounts to be used for purchases. In Claim 1, steps (a) through (e) are the setup. Step (a) recites "providing a personal code to a person for their use to purchase goods." In step (b), the personal code is "convert[ed] into barcode format to form a User ID Barcode" that includes "at least one special character to distinguish" it from product barcodes. In step (c), both the customer and the vendor store the User ID Barcode: the customer (according to Claims 2 and 3) might store it on her cellphone or on a label affixed to her credit card or cellphone, and the vendor stores it in a "User Vendor Management Server." On the vendor's management server, the vendor then establishes a "User Account" for the particular user in step (d). In step (e), someone "deposit[s] funds in said User Account to establish a credit limit."

After steps (a) through (e), the individual accounts are ready to be used for repeated purchases. In step (f), the user "conduct[s] purchases at vendors" by scanning both product barcodes and the User ID Barcode. In step (g), the User ID Barcode is "detect[ed] and "forward[ed]," along with the purchase price, to the vendor's management server. In step (h), the vendor's management server "compar[es]" the price to the funds available in the user's account and, if the funds are sufficient, "send[s] an approval signal" back.[4] In step (i), the approval signal is "forward[ed] . . . to

---

[4] Step (h) is the "verifying a customer's ability to pay" that Albertsons had identified as the focus.

-12-

the vendor cash register." Finally, step (j) says to "repeat[] steps (f) through (i) for subsequent purchase transactions using [the same] User ID Barcode."

The claims' focus of setting up and using individual accounts for purchases is a "fundamental economic practice," *see W. Express*, 816 F. App'x at 486, similar to those that the Supreme Court and Federal Circuit have "already found to be directed to an abstract idea." *See Enfish*, 822 F.3d at 1334 (explaining that determining abstractness at *Alice* step one may be sufficiently done by comparison to previous cases). For example, in *Western Express*, the patent at issue described "the basic concept of a payment card." 816 F. App'x at 486.[5] The Federal Circuit held that the patent contained nothing beyond a 'fundamental economic practice long prevalent in our system of commerce.'" *Id.* at 487 (quoting *Alice*, 573 U.S. at 219). In so holding, the Federal Circuit rejected the plaintiff's arguments that its patent "solve[d] several problems associated with prior art money account cards," including "creating a bank account without an approval process" and "allowing the immediate purchase of goods." *Id.* Those purported "advantages" were "just the conventional benefits of a payment card." *Id.*

Here, like the "basic concept of a payment card" in *Western Express*, the '689 Patent's focus of setting up and using individual accounts for purchases is an abstract idea. Setting up the accounts in steps (a) through (e) is akin to the "basic concept of a payment card"—here, the "payment card" is instead an individual account at a store. Using the account for purchases in steps (f) through (j) builds on the same basic concept: once you have the individual account (or payment card), then you use it to make purchases. Nothing in the '689 Patent's focus goes beyond "the conventional benefits"

---

[5] The patent in *Western Express* also contained a funds-transfer step that is not relevant here.

of having an individual account for purchasing items at a store. *See id.* Thus, the focus of the '689 Patent is directed to an abstract idea.

Even without the direct analogy to *Western Express*, the Court could reach the same conclusion because the "innovative aspect of the claimed invention" is "entrepreneurial," not "technological." *See Solutran*, 931 F.3d at 1166 (citation omitted). In *Solutran*, the patent at issue involved "a system and method of electronically processing paper checks" that merely "recite[d] basic steps of electronic check processing." *Id.* at 1163, 1166. The patent's alleged innovation was in the ordering of the patent's steps, which taught crediting a merchant's account before scanning the check. *See id.* at 1167. Analogizing to previous Supreme Court case law, the Federal Circuit held that crediting the merchant's account earlier rather than later was an abstract idea. *See id.* (analogizing to *Bilski v. Kappos*, 561 U.S. 593 (2010), and *Alice*). The Federal Circuit rejected the notion that "the claims '[were] directed to a specific improvement to the way computers operate' and therefore not directed to an abstract idea." *Id.* (quoting *Enfish*, 822 F.3d at 1327). The claims "did not improve the technical capture of information from a check to create a digital file or the technical step of electronically crediting a bank account"; did not "improve how a check is scanned"; and were not "'limited to rules with specific characteristics' to create a technical effect." *Id.* (citations omitted). Involving no arguable technological improvement and reflecting only "[t]he desire to credit a merchant's account as soon as possible," the patent in *Solutran* was directed to a patent-ineligible abstract idea. *See id.*

Like the idea to credit a merchant's account sooner in *Solutran*, the idea to set up and use individual accounts here is entrepreneurial, not technological. It reflects a solution to the business issue of how a store's customers can pay for goods, not some purported improvement to the

technology used for payment. The nontechnological nature of the '689 Patent will become more apparent from the step-two analysis below, but for the purposes of *Alice* step one, the '689 Patent's focus is merely entrepreneurial. The '689 Patent is therefore directed to an abstract idea and fails *Alice* step one.

   2.    At *Alice* Step Two, the '689 Patent Contains No Inventive Concept to Transform the Claims Into Patentable Subject Matter.

To avoid dismissal at *Alice* step two, Wolverine raises two assertedly inventive features. First, Wolverine argues that the '689 Patent contains "the provision of enabling 'the user to automatically register with the [vendor's management server] without requiring the user to enter details of personal information upon the user's first use of the User ID Barcode for purchasing goods.'" Doc. 29, Resp., 8 (quoting '689 Patent at 4:29–33). Second, Wolverine argues that "security for the user's personal sensitive information is improved" through the '689 Patent's method. *Id.* (quoting '689 Patent at 5:66–67).

Neither of these assertedly inventive features save the '689 Patent. For starters, both features come from the specification, rather than the claims. "To save a patent at step two, an inventive concept must be evident in the claims." *RecogniCorp*, 855 F.3d at 1327 (first citing *Alice*, 573 U.S. 221; and then citing *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016)). A specification might shed light on why a concept from the claims is arguably inventive, but a specification cannot supply the inventive concept. Even if it could, the two assertedly inventive features raised by Wolverine do not "explain *how* the desired result is achieved" through some technological improvement. *See Elec. Power Grp.*, 830 F.3d at 1355. The '689 Patent does not teach *how* a user can automatically register with the vendor's management server on first use of her barcode. And the idea that the user does not need to provide personal information for her barcode

is not a technological improvement but just the abstract idea that the code used to individualize accounts can be based on non-personal information.

Even examining the '689 Patent's claims beyond what Wolverine has raised, no other technological concept recited therein—such as barcodes, scanners, or servers—is arguably inventive. A pertinent comparison is *Secured Mail Solutions*, where the Federal Circuit assessed seven patents that all "involve[d] methods whereby a sender affixes an identifier on the outer surface of a mail object (e.g. envelope or package) before the mail object is sent." 873 F.3d at 907. For all seven patents, "[c]omputers and networks are used to communicate the information about the mail object's contents and its sender after the mail object is delivered." *Id.* The Federal Circuit labeled one group of patents that "recite[d] a method for verifying the authenticity of the mail object" as "the Intelligent Mail Barcode patents." *Id.* In that group of patents, the "identifier" or "barcode" affixed to the mail object was "a single set of encoded data that is generated by concatenating a sender-assigned unique identifier with sender data, recipient data, and shipping method data." *Id.* That identifying barcode would also be stored in a database, which the recipient of the mail object could access to verify that the mail object she received was authentic. *Id.*

Having found that all seven patents' claims in *Secured Mail Solutions* "embrace[d] the abstract idea of using a marking affixed to the outside of a mail object to communicate information about the mail object," the Federal Circuit turned to *Alice* step two. *See id.* at 911. For the Intelligent Mail Barcode patents, the Federal Circuit assessed the elements of generating the identifier by "combining various pieces of data" and observed:

> The data need not even be in the form of a barcode, much less a specific new type of barcode. The claim language does not explain how the sender generates the information, only that the information itself is unique or new. The claim language

does not provide any specific showing of what is inventive about the identifier or about the technology used to generate and process it.

*Id.* at 911–12. With no arguably inventive concept to save the claims, the Federal Circuit affirmed the district court's decision to dismiss on a Rule 12(b)(6) motion. *See id.* at 912–13.

Here, as with the Intelligent Mail Barcode patents in *Secured Mail Solutions*, the '689 Patent's claims "do[] not provide any specific showing of what is inventive about the identifier or about the technology used to generate and process it." *See id.* at 912. The '689 Patent does limit itself to a barcode but not to "a specific new type of barcode." *See id.* at 911. The '689 Patent also does not explain the technical steps necessary to generate the barcode, scan it, process it, or communicate approval of the purchase. *See id.* at 911–12. And neither the '689 Patent's specification nor Wolverine's briefing asserts that the technology of barcodes, scanners, or servers were invented by the '689 Patent. Thus, although the '689 Patent invokes the use of technology, it does not contain an arguably inventive concept sufficient to save the claims at *Alice* step two. *See Elec. Power Grp.*, 830 F.3d at 1355 ("We have repeatedly held that such invocations of computers and networks that are not even arguably inventive are 'insufficient to pass the test of an inventive concept in the application' of an abstract idea." (citations omitted)).

Zooming out to the ordered combination of the claim elements, the '689 Patent still lacks an arguably inventive concept. *See Alice*, 573 U.S. at 217 (prescribing consideration of claims "as an ordered combination" at step two (citation omitted)). An inventive concept can exist "in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM*, 827 F.3d at 1350. But the logical ordering of first setting up individual customer accounts and then allowing their use for purchases is not an arguably inventive way of using known technology, and Wolverine makes no argument to the contrary.

Finally, Wolverine argues that the '689 Patent solves "a specific problem arising in electronic commerce." Doc. 29, Resp., 8–10. In support, Wolverine attempts to analogize to *Messaging Gateway Solutions, LLC v. Amdocs, Inc.*, Nos. 14-732-RGA–14-737-RGA, 2015 WL 1744343 (D. Del. 2015). *See id.* That case involved a patent "directed to a problem unique to text-message telecommunication between a mobile device and a computer." *Messaging Gateway Sols.*, 2015 WL 1744343, at \*5. Addressing a limitation in conventional technology where "phones could not send SMS text messages to computers," the patent in *Messaging Gateway Solutions* provided a solution "tethered to the technology that created the problem." *Id.* The patent's solution specified how the interaction between a phone and computer could be manipulated so that the phone could send a message in its language (SMS text) that could then be received and understood by the computer in its language (Internet Protocol message). *See id.* at \*2–3, \*5. Thus, the patent in *Messaging Gateway Solutions* was patent-eligible because it was "firmly rooted in technology" and "addressed . . . a specific problem arising in the realm of mobile device-to-Internet communication." *Id.* at \*6.

Wolverine's attempted analogy to *Messaging Gateway Solutions* does not make sense. The '689 Patent does not address a specific technological problem like the phone-to-computer communication problem addressed in the patent in *Messaging Gateway Solutions*. Instead, the '689 Patent addresses the business problem of finding another way for customers to pay.

Wolverine seems to think of "e-commerce" as a technological realm and argues that the '689 Patent's method of setting up individual accounts and allowing their use was "not possible prior to the claimed invention." *See* Doc. 29, Resp., 8 (citing '689 Patent at 3:40–67). But e-commerce is not a technological realm. It is a commercial one. And, most importantly, the '689 Patent does not even arguably introduce any new technology to that commercial realm. The '689 Patent might introduce

a new method for doing commerce, but that method, as explained above, is no more than the abstract idea of setting up and allowing the use of individual store accounts. Even if no one before thought of that method, "a claim for a *new* abstract idea is still an abstract idea." *Synopsys*, 839 F.3d at 1151.

When the "alleged 'inventive concept' that solves problems identified in the field" is the "abstract idea itself," there is no inventive concept sufficient to save the patent at *Alice* step two. *See ChargePoint*, 920 F.3d at 774. With nothing in the '689 Patent's claims besides the abstract idea of setting up and allowing the use of individual store accounts, the '689 Patent is ineligible for patent protection.

C.      *Leave to Amend Would be Futile.*

"Whether leave to amend should be granted is entrusted to the sound discretion of the district court, and that court's ruling is reversible only for an abuse of discretion." *Young v. U.S. Postal Serv. ex rel. Donahoe*, 620 F. App'x 241, 245 (5th Cir. 2015) (citations omitted). "Denial of leave to amend is appropriate where there is no indication that amendment would cure the defects in a complaint." *Id.* "No amendment to a complaint can alter what a patent itself states." *Sanderling Mgmt. Ltd v. Snap Inc.*, 65 F.4th 698, 706 (Fed. Cir. 2023). The Court has scrutinized the '689 Patent and Wolverine's allegations and arguments for anything that might save the '689 Patent from ineligibility. Finding nothing, the Court concludes that the '689 Patent is ineligible for patent protection, and allowing Wolverine another chance at pleading would be futile.

## IV.

## CONCLUSION

Albertsons's Motion to Dismiss (Doc. 24) is **GRANTED** because the '689 Patent claims a patent-ineligible abstract idea, and the case is **DISMISSED WITH PREJUDICE**. A final judgment will follow.

**SO ORDERED**.

**SIGNED: July 9, 2026.**

JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE